(No. 12712.—Reversed and remanded.)

THE SCHILLER PIANO COMPANY, Appellant, *vs.* THE ILLINOIS NORTHERN UTILITIES COMPANY, Appellee.

*Opinion filed June 18, 1919.*

1. POLICE POWER—*property rights are subject to the exercise of police power.* All property in the State is held subject to the police power to so regulate its use in a proper case as to secure the safety, health, morals, good order and general welfare of the community.

2. SAME—*exercise of police power must be necessary and reasonable.* Statutes in the exercise of the police power are sustained on the theory that they are necessary for the safety, health, morals or welfare of the public, and an unreasonable invasion of private rights or impairment of the rights of property guaranteed by the constitution, under the guise of the police power, will not be sustained.

3. SAME—*contract rights are subject to the exercise of police power.* The constitutional prohibition upon a State to pass any law impairing the obligation of contracts does not limit the right of the State to pass laws for the protection of the public health, safety or morals, and rights and privileges arising from contracts are subject to such regulations.

4. SAME—*what is measure of reasonableness of police regulation.* The measure of reasonableness of a police regulation is not necessarily what is best ·but what is fairly appropriate under all the circumstances.

5. SAME—*what conduct is not subject to police power.* Legislation in the exercise of the police power must have relation to and be appropriate for the protection, preservation and promotion of the public health, safety, morals or welfare, and conduct which has no tendency to affect or endanger the public in any of those particulars and which is entirely innocent in character is not subject to the police power.

6. SAME—*extent to which business of a public utility may be regulated under police power.* Under the police power the State has authority to enact legislation to regulate the charges and business of a public utility corporation, but if such legislation operates as a confiscation of private property or constitutes an arbitrary or unreasonable infringement on personal or property rights it will be held void, as in violation of the constitutional guaranty that no person shall be deprived of his property without due process of law.

7. PUBLIC UTILITIES—*purpose of Public Utilities act.*  The Public Utilities act has no relation to the health, safety or morals of the public, but the object of the statute is to regulate public service corporations in the interest of the public welfare, and it is not intended to destroy property where such destruction is not necessary to accomplish the objects and benefits of the legislation.

8. SAME—*when Public Utilities act does not abrogate existing contract.*  Where a power company, before the passage of the Public Utilities act, has contracted to furnish electric power to a manufacturing plant at a certain rate in consideration of a conveyance of the latter's water power rights in a dam, the performance of the contract will not be enjoined as being a discrimination in rates prohibited by such statute, as the contract may be performed without public injury and is not abrogated by the passage of the act.

APPEAL from the Circuit Court of Ogle county; the Hon. OSCAR E. HEARD, Judge, presiding.

J. C. SEYSTER, for appellant.

FRANC BACON, and RALPH D. STEVENSON, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

This appeal is prosecuted by the Schiller Piano Company from a decree of the circuit court of Ogle county denying the relief prayed in a bill filed by the Schiller Piano Company against the Illinois Northern Utilities Company and dismissing the bill for want of equity.

The bill alleged, in substance, that appellant is, and has been for more than twenty years, engaged in the manufacture of pianos at Oregon, Illinois, at the west end of a dam there located across Rock river for the purpose of furnishing power for carrying on various manufacturing enterprises. The dam was alleged to be 924 feet long and of sufficient height to create power estimated equal to 1000 horse power. December 28, 1910, appellant owned 117 horse power created by said dam, and on that day it entered into a contract with the Oregon Power Company whereby appellant sold and transferred its 117 horse power

created by the dam to the Oregon Power Company in consideration of the agreement of that company to furnish the appellant perpetually thereafter, at its factory, with 90 kilowatts of electrical power free of charge, and all power furnished appellant in excess of 90 kilowatts should be paid for. The Oregon Power Company agreed to pay appellant $25 per day for each day it failed to furnish the power as agreed. The contract was performed until May 2, 1912, when a new contract between the parties was made, by which the Oregon Power Company was released from its obligations created by the former contract, and by the new contract the Oregon Power Company, for itself, its successors and assigns, agreed to continuously supply appellant with 72.4 kilowatts of electrical power or energy free of charge unless prevented by act of God or inevitable accident. The contract of May 2, 1912, it is said, was made in lieu of the contract of December 28, 1910, because, while it is undisputed that 117 horse power owned by appellant would create 90 kilowatts of electrical energy, there would be such loss in transmitting it to appellant as would reduce it to 72.4 kilowatts. At the time the contract of May 2 was made, the Oregon Power Company owned a steam plant at the west end of the dam, to be used to supply power when the dam for any reason failed to do so. Shortly after the date of the second contract the Oregon Power Company sold and transferred its rights and properties in the dam to the Illinois Northern Utilities Company, appellee, which assumed the obligations of the Oregon Power Company and furnished appellant power according to the contract until October 25, 1913, when it notified appellant in writing that the dam having been taken out by high water it would discontinue furnishing appellant power after November 1, following. The bill alleges a break had occurred in the dam which could have been easily repaired, but appellee neglected and refused to repair it. The bill was filed October 31, alleging all the facts and the injury appellant would

suffer if appellee did not furnish it power, and praying appellee be enjoined from turning off or discontinuing the power to appellant's plant under the contract and that said contract be enforced. A temporary writ of injunction was issued.

Appellee answered the bill and denied appellant was entitled to the relief prayed. The case was referred to the master in chancery to take and report the proofs, together with his findings thereon. The appellant having closed its proofs, at the January term, 1917, a rule was entered against appellee to close its proofs by the first day of the next term of the court. The record does not show the rule was complied with, but on October 9, 1918, appellee filed its cross-bill, alleging it was a corporation organized under the laws of Illinois; that it owned and operated for public use, property for the production, transmission, sale and delivery of electric light, heat and power in the vicinity of Oregon and other parts of Illinois; that from the time the cross-complainant acquired the property of the Oregon Power Company to October 31 it had voluntarily supplied appellant with power, and that since that time it had furnished power under compulsion of the injunction granted by the circuit court. The cross-bill alleged that January 1, 1914, the Public Utilities act went into effect; that appellee is a public utility, and the act provides that charges for service made by a public utility shall be reasonable and just and all unjust and unreasonable charges shall be unlawful; that the act requires a public utility company to file with the State Public Utilities Commission a schedule of its rates and charges, and prohibits charging or receiving any different rate than that provided in the schedule of rates. The substance of some of the provisions of the Public Utilities act are set out, and the cross-bill avers that by virtue of said act the contract to furnish appellant power became unlawful and it became and is unlawful for appellee to supply appellant with power free of charge. The cross-bill prays

that the temporary injunction be dissolved and appellant's bill dismissed.

Appellant answered the cross-bill, denying appellee had furnished it power free of charge and averring that it had paid for its power by the consideration expressed in the contract. The answer further denied the performance of the contract was rendered unlawful by the Public Utilities act, and denied appellee was entitled to the relief prayed in the cross-bill. The motion to dissolve the injunction was heard on the pleadings and affidavits in support of and in opposition to the motion, and a decree entered dissolving the injunction and dismissing the original bill.

Three questions involved are (1) whether the Public Utilities act made the contract unlawful, and to compel its performance by continuing the injunction in force would be requiring appellee to violate the law; (2) whether the original contract was invalid at common law, in that it unfairly discriminated in favor of appellant; (3) whether appellant's bill alleged facts entitling it to the writ of injunction.

All property in a State is held on the implied condition or obligation that the owner will so use it as not to interfere with the rights of others and subject to such reasonable regulations as the legislature may impose upon its use in order to protect the public and others in the use of their property. It is held subject to the police power of the State to so regulate its use in a proper case as to secure the safety, health, morals, good order and general welfare of the community. There are limitations, however, to the police power, and an unreasonable invasion of private rights or impairment of the rights of property guaranteed by the constitution, under the guise of the police power, will not be sustained. The constitutional prohibition upon a State to pass any law impairing the obligation of contracts does not limit the right of or prohibit the State from passing laws for the protection of the public health, safety or mor-

als, and rights and privileges arising from contracts are subject to such regulations. Instances of these principles frequently cited are, that when entered into a contract to sell liquor, operate a brewery or distillery or conduct a lottery may be lawful, but such contracts are subject to impairment by a change of policy on the part of the State. That such change of policy by the State may prevent the enjoyment of individual rights in property without providing compensation therefor does not necessarily render such legislation unconstitutional, but such legislation must, to be within the police power, be reasonable in its operation on persons affected by it and not unduly oppressive. Such statutes are sustained on the theory that they are necessary for the safety, health, morals or welfare of the public, and a restriction or regulation without reason or necessity cannot be enforced. The measure of reasonableness of a police regulation is not necessarily what is best, but what is fairly appropriate under all the circumstances. Legislation in the exercise of the police power must have relation to and be appropriate for the protection, preservation and promotion of the public health, safety, morals or welfare. An act which has no tendency to affect or endanger the public in any of those particulars and which is entirely innocent in character is not within the police power. These general principles are universally recognized and will be found discussed and numerous authorities referred to in 6 R. C. L. 193, *et seq.* Under the police power the State has authority to enact legislation to regulate the charges and business of a public utility corporation, but if such legislation operates as a confiscation of private property or constitutes an arbitrary or unreasonable infringement on personal or property rights it will be held void, as in violation of the constitutional guaranty that no person shall be deprived of his property without due process of law. The Public Utilities act of this State has no relation to the public health, safety or

morals, but was enacted to protect the public against unreasonable charges and discrimination and to promote the general welfare.

When the contract between the Oregon Power Company and appellant was made it was a valid and lawful agreement, not contrary to the common law or any statute. Contracts void at common law are contracts against public policy because injurious to the public welfare. This was not such a contract. Appellant by the contract sold and transferred to the Oregon Power Company the 117 horse power of which it was then the owner, in consideration of the agreement of the Oregon Power Company that it, its successors and assigns, would furnish appellant the power agreed upon. The contract was performed by that company until it sold the dam and all its rights therein to appellee, the Illinois Northern Utilities Company, and that company continued to furnish the power under the contract until October 25, 1913, when it notified appellant that because the dam, or part of it, had been washed out it would discontinue supplying power November 1, following. In October, 1918, appellee's cross-bill was filed, alleging the passage and approval of the Public Utilities act; that it became effective January 1, 1914, and that said act made it unlawful for appellee to perform the contract. It must be assumed that what appellee's predecessor acquired from appellant under the contract was worth the consideration agreed to be paid. Appellee purchased the property with knowledge of the contract and the consideration for it. It acquired the property and rights of appellant and became obligated to pay the consideration therefor. It now seeks to avoid that obligation on the ground that the Public Utilities statute was enacted by the legislature in the exercise of the police power and that said act renders the performance of the contract unlawful.

That the Public Utilities statute was a valid exercise of the police power for the purposes for which it was enacted

must be conceded, but it does not necessarily follow that it operated to render the performance of this contract unlawful. The object of the statute was to regulate public service corporations in the interest of the public welfare. Any contract to furnish service in violation of that act would be unlawful, but the situation here presented is not a contract to furnish appellant power at a less rate than the approved schedule of charges. It may be conceded that if appellant, owning no interest in the dam, had before the passage of the Public Utilities act entered into a contract with appellee to purchase power at a certain rate or charge per annum and the rate fixed was lower than the authorized schedule, the performance of the contract would have been unlawful after the act went into effect. Here, however, appellant conveyed and transferred its property as the consideration for the power, and the effect of holding the performance of the agreement was made unlawful by the legislation referred to, takes from appellant its property without compensation and without due process of law. The right of appellant under the contract was property. The right of property is a fundamental right and its protection is one of the most important objects of government. There is nothing in the contract and its performance which is detrimental to the public interest and welfare, for the protection and promotion of which the Public Utilities act was adopted. It jars unpleasantly on one's sense of justice to say the effect of the statute was to destroy or confiscate appellant's property for the benefit and advantage of appellee. We are aware courts have gone to considerable length in holding that legislation enacted in the proper and reasonable exercise of the police power will not be held invalid because it may impair the obligation of contracts or deprive the owner of property without due process of law, but the qualification that such legislation must be proper and reasonable for the purpose sought to be accomplished is an important one. True, private rights must yield to consid-

eration of the public safety, health, morals and welfare, and no investment in property, however large, will preclude the exercise of the governmental power of regulation when reasonably necessary for these purposes, but our attention has not been called to any case where the exercise of such power has been sustained when not necessary for these objects. None of the subjects which are the valid basis for the exercise of the police power were involved in the contract. It could in no way affect the public health or safety, was not contrary to good morals or the public interest and welfare. If the protection of one or more of these things is necessary to a valid exercise of the police power, how can it be said the performance of the contract was made unlawful by the statute? It seems to us it would be pushing the valid exercise of the police power to unreasonable limits to so hold. It must be admitted the situation here is unusual and could not have been contemplated by the legislature. That body, in enacting the Public Utilities statute, sought only to regulate public service companies. It did not intend to destroy property where such destruction was wholly unnecessary to accomplish the objects and benefits of the legislation. Full effect may be given the statute for the purposes for which it was enacted and the contract performed at the same time without injury of any character to the public. On the contrary, it would offend against good morals and common honesty, now that appellant has conveyed its property to appellee, to give the statute the effect of having relieved appellee of the obligation to pay for it. We would only be justified in so construing the statute if such construction were reasonably necessary for the protection of the public. This we have endeavored to show is neither involved nor necessary in sustaining this contract. The contract did not provide for furnishing free service. The equivalent in value for the service agreed to be furnished was paid by appellant by the conveyance of its property. We have not overlooked *Hite* v. *Cincinnati*,

*Indianapolis and Western Railroad Co.* 284 Ill. 297, *Louisville and Nashville Railroad Co.* v. *Mottley,* 219 U. S. 467, and other cases relied on by appellee, some of which we think distinguishable and others not controlling.

The decree of the circuit court is reversed and the cause remanded for further proceedings not inconsistent with the views herein expressed.          *Reversed and remanded.*