(No. 34607.—

THE PEOPLE *ex rel.* Benjamin S. Adamowski, Appellant,
*vs.* CHICAGO LAND CLEARANCE COMMISSION, Appellee.
—(RALPH J. FINITZO *et al.,* Intervenors, Appellants.)

*Opinion filed May 21, 1958—Rehearing denied June 18, 1958.*

BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (L. LOUIS KARTON, and FRANCIS X. RILEY, of counsel,) for appellant; McCARTHY & LEVIN, of Chicago, (JOHN F. McCARTHY, and ESTHER R. ROTHSTEIN, of counsel,) for intervenors-appellants.

ELSA C. BECK, WILLIAM F. MORRISSEY, and WILLIAM H. DILLON, all of Chicago, for appellee.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

The State's Attorney of Cook County brought a *quo warranto* action in the circuit court of Cook County against the Chicago Land Clearance Commission, challenging the validity of the 1955 amendments to the Blighted Areas Redevelopment Act of 1947. (Ill. Rev. Stat. 1955, chap. 67½, par. 63 *et seq.*) It is charged in the complaint that the Commission acting under the authority of said amendments is expending public funds in making surveys and developing plans for open lands described as "blighted" to be developed for industrial use, or for other than residential use; and that the act, insofar as it purports to authorize a "Blighted Area Project" of this character, is unconstitutional and void. The circuit court dismissed the action on motion, finding the amendatory act to be constitutional. The plaintiff and individual intervenors in said cause seek a review in this court.

The validity of the amendatory act is challenged on three grounds: (1) It is a taking of private property for other than a public use; (2) it constitutes an unlawful

delegation of legislative power; and (3) it is vague, indefinite and uncertain in its terms.

The original of the "Blighted Areas Redevelopment Act" of 1947 was upheld and its validity sustained in *People ex rel. Tuohy* v. *City of Chicago,* 399 Ill. 551, *Chicago Land Clearance Commission* v. *White,* 411 Ill. 310 (cert. denied, 344 U.S. 824), and *Chicago Land Clearance Commission* v. *White,* 1 Ill.2d 69. In 1949 certain amendments were made to the act so as to bring within the operation of the act areas known and designated as "Blighted Vacant Areas." These 1949 amendments provided that these areas should be developed for predominately residential use. This court in *People ex rel. Gutknecht* v. *City of Chicago,* 414 Ill. 600, held these amendments valid.

At the 1955 session of the Illinois General Assembly the sections of the act dealing with "blighted vacant areas" were further amended so as to authorize development of these areas for residential "or other use." It is with this action of the Illinois General Assembly that we are concerned here. It is to be noted that the definition or description of a blighted vacant area, as set forth in the amendments of 1949 was not changed by the 1955 amendments here in question, and was upheld by this court in *People ex rel. Gutknecht* v. *City of Chicago,* 414 Ill. 600. The 1955 amendments permit development of said areas for residential or other uses, subject to the proviso that only if the area is zoned for other than residential use and the Commission determines that residential development of the area is not feasible, and such determination is approved by the mayor, city council and the State Housing Board, other uses may be permitted. It is the words "other use" that cause the controversy here.

The first contention of the appellants is that the 1955 amendments authorize the taking of private property for other than a public use and are therefore unconstitutional. The definition of a blighted area redevelopment project,

insofar as it defines the type of land authorized to be acquired, is the same after the 1955 amendments as it was before. The statute continues to read as it did after the amendments made to the Blighted Areas Redevelopment Act in 1949. Therein said areas were defined as follows: "(1) 'Blighted Vacant Area Redevelopment Project' means a project involving (1) predominantly open platted urban or suburban land which because of obsolete platting, diversity of ownership, deterioration of structures or of site improvements, or taxes or special assessment delinquencies exceeding the fair value of the land, substantially impairs or arrests the sound growth of the community and which is to be developed for predominantly residential uses, * * *." Ill. Rev. Stat. 1949, chap. 67½, par. 65(1).

The court in *People ex rel. Gutknecht* v. *City of Chicago,* 414 Ill. 600, held that the 1949 amendments were constitutional and in so doing used the following language on pp. 613-614 of said opinion: "Upon the authority of the *Cremer, Zurn,* and *White cases,* we hold that the Amendatory Act does not violate section 13 of article II of the constitution. The purpose and use to which the vacant blighted property is to be taken is both a public purpose and a public use, since the taking tends to alleviate a housing shortage, is an essential aid and adjunct to slum clearance, removes hazards to health, safety, welfare and morals of the community by developing the area, and eliminates factors impairing and arresting sound community growth."

In *People ex rel. Gutknecht* v. *City of Chicago,* 3 Ill.2d 539, the court cast aside the argument that the power of eminent domain could only be used to eliminate slum areas and not for the prevention of slums, by stating "we are aware of no constitutional principle which paralyzes the power of government to deal with an evil until it has reached its maximum development."

The appellants apparently agree with all the foregoing enunciations of this court, but say that the 1955 amend-

ments are unconstitutional because the amendments here provide that after the acquisition of the vacant areas in question it may be developed for other than residential uses. They claim that in the *Gutknecht case* (414 Ill. 600) the acquisition of the areas was coupled with a housing development and therefore the acquisition and the housing development made it a public use. However, an examination of the 1955 amendments discloses that the amendments here provide primarily for the development of the area for residential purposes. It is only the one proviso in said amendments that permits a development for other uses. Said proviso only applies where areas to be acquired are zoned for other than residential use and the Commission determines that residential development of the area is not feasible and such determination is approved by the mayor, city council and State Housing Board.

This court and other courts have repeatedly held that the acquisition of a slum and blighted area and the removal of slum conditions is in and of itself a public purpose regardless of the use thereafter made of the property. *Chicago Housing Authority* v. *Berkson,* 415 Ill. 159; *Zurn* v. *City of Chicago,* 389 Ill. 114; *People ex rel. Tuohy* v. *City of Chicago,* 394 Ill. 477; *Cremer* v. *Peoria Housing Authority,* 399 Ill. 579.

The appellants apparently have no quarrel with any of these cases, which state that the public purpose is accomplished by the acquisition of the area and removal of the slum conditions and that the redevelopment of the area is purely incidental. They contend here, however, that in the case of a blighted area there is no change in the area until the redevelopment takes place and therefore that the development and not the acquisition of the area constitutes the public purpose, and that because the area may be developed for other than residential uses the public purpose fails.

In section 2 of the act, as it stands amended in 1955, it is declared as a matter of public policy by the General Assembly that blighted vacant areas, for the reasons set forth therein, are unmarketable and as a result impair the growth of the communities and are a blight thereon by preventing the construction of critically needed residential housing or other appropriate development. It is also declared that the existence of these areas constitutes a menace to the public health, safety, welfare and morals.

The appellants contend that after an area is acquired under the 1955 amendments it may never be developed. In this they are mistaken, for section 3(1) of the act provides that a blighted vacant area redevelopment project means a project involving "predominantly open platted urban or suburban land which  *  *  *  is to be developed for residential or other use." Section 19.1 of the act (Ill. Rev. Stat. 1957, chap. 67½, par. 81a,) provides that no sale may be made by the Commission until such time as it has prepared and approved a development plan for the area, and which has been approved by the State Housing Board, and the governing body of the municipality in which the property is located. Section 19 requires assurance of such development by the purchaser and it further provides that if the real property has not been sold by the Commission in five years after it has acquired title to all the property in the area, it shall be sold for cash to the highest bidder, who shall obligate himself to develop the property in accordance with the approved plan. It necessarily follows that the elimination of a blighted vacant area as defined in the act is itself a public purpose regardless of the type of redevelopment thereafter.

The second contention of the appellants is that the act as amended in 1955 is unconstitutional in that it constitutes an unlawful delegation of legislative power contrary to article III and section 1 of article IV of the Illinois constitu-

tion. The State's Attorney contends that the determination of whether an area is or is not a blighted vacant area is dependent not only on the existence of the factors set forth in the definition of a blighted vacant area, but also upon a finding that residential development is not feasible, and that the land may be put to other uses than residential. The act, by the 1955 amendments, provides that before any area may be developed for any other use than residential there must be a finding by the Commission that residential development is not feasible.

The appellants insist that the determination of the feasibility of residential development is not adequately safeguarded by legislative directives controlling and limiting the method of formulating such finding. Moreover, appellants object that the "other use" to which the property may then be put is likewise not sufficiently defined so as to limit and circumscribe the Commission to the legislative will, and avoid the unlawful delegation of authority.

The legislature cannot delegate its power to make a law, but it can make a law delegating a power to determine some facts or state of things upon which the law makes, or intends to make, its own action depend. "Delegation of power to make the law is forbidden, as necessarily involving a discretion as to what the law shall be; but there can be no valid objection to a law, which confers an authority or discretion as to its execution, to be exercised under and in pursuance of the law itself." (*City of Chicago* v. *Stratton,* 162 Ill. 494.) Thus "while the legislature may not divest itself of its proper functions, or delegate its general legislative authority, it may still authorize others to do those things which it might properly, yet cannot understandingly or advantageously do itself. Without this power legislation would become oppressive, and yet imbecile." *People ex rel. Caldwell* v. *Reynolds,* 5 Gilm. 1.

"The constitutional doctrine of separation of powers was not intended to confine the legislature to the alterna-

tives of complete inaction or the imposition of rigidly inflexible laws which would distort rather than promote its objective. When it is necessary, the legislature may commit to others the responsibility for the accomplishment of the details of its expressed purpose. The scope of permissible delegation must be measured in terms of the complexity and diversity of the conditions which will be encountered in the enforcement of the statute. So it has been said almost from the outset that the legislature may authorize others to do things which it might properly, but cannot understandingly or advantageously, do itself." *Dept. of Public Works* v. *Lanter*, 413 Ill. 581, 589; *People* v. *Illinois Toll Highway Com.* 3 Ill.2d 218.

"Feasible" is defined in Webster's New Twentieth Century Dictionary, Unabridged, 2d ed., 1958, as referring to that which "may be used or dealt with successfully, as, land *feasible* for cultivation." The legislature in using this word thus meant such land as could not be used or dealt with successfully for residential purposes. Moreover, this matter arises for determination by the Commission only if the property is zoned for other than residential use, and then only if the plan is approved by the presiding officer and the governmental body of the municipality and the State Housing Board. Certainly the legislature could not, understandingly or advantageously, make such determination itself. The various areas that might be affected by this legislation will differ substantially, as will the municipalities in which they lay. The legislative purpose is adequately expressed and defined, but the various factors to be considered in completing the legislative plan, while easily and obviously ascertainable, would be too complex and diverse to permit legislative expression and consideration so as to guide closely such determination.

The uses other than residential, to which land may be legitimately and practically put are common and well known. They are so obvious in fact as to call for no

legislative or judicial pronouncement, but also so limited for each area and condition as to be impossible of exact legislative direction. It is clearly evident, that no community can exist for residential purposes only, unaffected by and unrelated to other proper purposes for which land may be used—be it industrial, business, recreational or agricultural. To determine the best or the proper purpose to which land unfit for residential use may be put, be the reason therefor the health or social or economic welfare of the present or future inhabitants of the area, requires expert and reasoned attention and determination. This act does not, by the 1955 amendments, unconstitutionally delegate legislative authority and power to the Commission.

The appellants additionally insist that the terms "feasible" and "other use" as used in the amended act are so vague, indefinite and uncertain in their meaning as to render the act, as applied to vacant areas, unconstitutional and invalid. We have shown that these words have, and can have only a limited applicable meaning. They are words of common usage, which acquire a special and limited significance in this context. The use of words which are commonly understood, when taken in conjunction with the context, does not render a statute invalid. A statute satifies the requirement of certainty if the words and phrases employed have a technical or other special meaning sufficiently well known to enable those within their reach to apply them. (*People ex rel. Gutknecht* v. *City of Chicago*, 414 Ill. 600.) The terms here questioned are no more uncertain than those terms questioned in the above *Gutknecht case* or the case of *People* v. *Illinois Toll Highway Com.* 3 Ill.2d 218, which were found adequately certain and definite. These terms, as used in this act as amended, are neither vague, indefinite, nor uncertain.

This amendatory act is not invalid for any of the reasons presented by appellants, and the act is constitutional.

The cause was properly dismissed by the circuit court of Cook County, and its judgment is affirmed.

*Judgment affirmed.*

Mr. JUSTICE KLINGBIEL, dissenting:

In my opinion the amendatory act attempts to confer power to take private property for other than a public use, in plain violation of the constitution. Under the statute as it existed prior to the amendments, vacant platted land of the described character could be acquired by condemnation only where it was "to be developed for predominantly residential uses." In *People ex rel. Gutknecht* v. *City of Chicago*, 414 Ill. 600, where this court upheld the power as so limited, it was pointed out that an acute housing shortage existed; that such vacant areas are incapable of development for housing purposes by private enterprise; and that "The Commission cannot acquire property by eminent domain until approval of a plan for its development for predominantly residential use by the Commission, the State Housing Board, and the City Council." By the present amendments this restriction on the use for which the land may be taken is eliminated. It is provided in effect that platted land of the designated type may be condemned for any use, if residential development thereof is not feasible; and the former requirement that condemnation must be preceded by an approved development plan has been eliminated. I can see here no semblance of public use to justify an exercise of the eminent domain power.

It is said that acquisition of the land by the Commission renders it marketable and thus accomplishes a public purpose irrespective of the manner of its development. Doubtless there is a public interest in the marketability of land, but a mere public purpose for the taking is not equivalent to a public use of the land. The power of eminent domain exists not to remedy evils but to acquire property needed for public use. It is the proposed use or development of

the property which must be looked to in determining whether it may be taken by condemnation. The fact that general prosperity and public welfare will be promoted is not enough. As this court said in *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* v. *Polecat Drainage District,* 213 Ill. 83, "the law must control the use to be made of the property, after it has been condemned, to the end that it shall be devoted to the public purpose which alone could justify the taking of the same from the owner without his consent." Under the provisions of the present amendments vacant land of the described character, if it is not feasible for residential development, may be developed for any other use whatever. In my view such a taking clearly disregards constitutional requirements for an exercise of eminent domain.

The presence of factors rendering land unmarketable, or creating hazards to health, safety, morals, or general welfare, may provide justification for appropriate measures under the police power, but until now they have never been deemed sufficient to warrant a taking by condemnation. Police power and eminent domain are distinct powers of government (*Sanitary District of Chicago* v. *Chicago and Alton Railroad Co.* 267 Ill. 252, 256-257; *City of Chicago* v. *Bowman Dairy Co.* 234 Ill. 294, 300-301;) and the requirements for a valid exercise of the one differ from those which apply to the other. In *City of Belleville* v. *St. Clair County Turnpike Co.* 234 Ill. 428, this court explained, at page 439, that "Under the police power the public welfare is promoted by regulating and restricting the use of property; under the exercise of the right of eminent domain the public welfare is promoted by the actual taking of the property *for some particular use.*" [Emphasis supplied.] In American Jurisprudence it is pointed out that "the police power, so far as it relates to property, is a power to regulate the use of property and is negative or inhibitory in its character. A man cannot be compelled under the police

power to devote his property to any particular use, however advantageous to himself or beneficial to the public, although he may be compelled to refrain from any use which is detrimental to the public." (11 Am. Jur. 1013, Constitutional Law, sec. 268; see, also, *City of Chicago* v. *Wells,* 236 Ill. 129.) Whenever a police regulation bears a substantial relation to the health, safety, morals and welfare of the public it must be sustained, but if it does not bear a material and definite relation to such interests it is void. (*People ex rel. Kirby* v. *City of Rockford,* 363 Ill. 531.) It will be observed, therefore, that the police power is subject in its exercise to constitutional limitations of a different nature than those which attach to the power of eminent domain. (*Slack* v. *Building Inspector of Town of Wellesley,* 262 Mass. 404, 160 N.E. 284.) Where it is sought to *take* private property, rather than merely to regulate its use, a different test applies. It is not enough to show a general relationship to public health, safety, morals, or welfare. The inquiry relates, instead, to the proposed use of the property. "It is to be observed that the courts distinguish between a use which is public and an interest which is public. Where there is simply a public interest, as distinguished from a public use, the power of eminent domain cannot be exercised." 18 Am. Jur. 663, Eminent Domain, sec. 36.

Under the present amendments no particular use of the property is prescribed. It is taken, not because of its usefulness, but because of factors tending to render it unmarketable. The purpose is not to use the property but to remedy evils. If a legitimate public interest exists in the marketability of vacant lands, grounds may be present for appropriate measures under the police power. But unless there is a public use for the land, it cannot be taken from its owner without his consent. Private property cannot be condemned on the ground that the general prosperity of the State or community would be promoted thereby, nor

is a mere relation to the objects of police power sufficient. (*Cleveland, Cincinnati, Chicago and St. Louis Railway Co. v. Polecat Drainage Dist.* 213 Ill. 83.) The right of property is a fundamental right and its protection is one of the most important objects of government. (*Schiller Piano Co. v. Illinois Northern Utilities Co.* 288 Ill. 580, 587.) The power to take from a citizen his property without his consent is a power "fraught with grave responsibility," (*Department of Public Works and Bldgs. v. Ryan,* 357 Ill. 150, 161,) and can be exercised only within constitutional limitations on the nature of the use to which the property is to be put. I think the 1955 amendments in question exceed those limitations and should be declared void.

Mr. JUSTICE HOUSE joins in this dissenting opinion.